UNITED STATES v. PHILADELPHIA & R. RY. CO.

(District Court, E. D. Pennsylvania. May 24, 1911.)

No. 17.

COMMERCE (§ 33\*)—INTERSTATE COMMERCE—CONTINUOUS SHIPMENT—VIOLATION OF ELKINS ACT.

The Elkins act (Act Feb. 19, 1903, c. 708, 32 Stat. 847 [U. S. Comp. St. Supp. 1909, p. 1138]), concerning interstate commerce, does not apply to a cargo shipped from Hamburg, Germany, destined, as stated in the bill of lading, to Philadelphia, for transportation in bond to Alberta, Canada, and taken to its destination by continuous and uninterrupted transportation at the hands of successive carriers; there being no delivery or

---

\*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

change of title, but the different carriers merely assisting in a continuous transportation from one foreign country to another.

[Ed. Note.—For other cases, see Commerce, Dec. Dig. § 33.*]

The Philadelphia & Reading Railway Company was indicted for violation of the Elkins act. Stipulation concerning facts submitted to the court, and verdict directed for defendant.

John C. Swartley, Asst. U. S. Dist. Atty., and J. Whitaker Thompson, U. S. Dist. Atty.

James F. Campbell and John G. Lamb, for defendant.

J. B. McPHERSON, District Judge (charging jury). The parties to this criminal proceeding have entered into a stipulation concerning the facts, and are agreed that a controlling question of law is presented thereby. They submit it for the court to decide, but I may say a few words to you in explanation of the decision. I shall not read the stipulation, as it is long, and the details might be difficult to follow; but the legal question may be stated thus: Does the Elkins act concerning interstate commerce apply to the continuous transportation of goods from a foreign country to a foreign country, if such goods are merely carried in bond across two or more states of the Union? In the case now on trial a cargo of sugar was shipped from Hamburg, Germany, destined, as the bill of lading states, "to Philadelphia for transportation in bond to Raymond, Alberta," Canada, and it was taken to its destination by continuous and uninterrupted transportation at the hands of successive carriers. A steamship company carried it across the Atlantic Ocean to Philadelphia. Here, it was loaded in bond upon railway cars and was transported over the connecting lines of successive carriers until it reached Alberta, the point of ultimate destination. The Philadelphia & Reading Railway Company carried it over part of the route at a less rate than would have been lawful if the shipment had originated at Philadelphia, and it is the charging of this rate that is alleged to be a criminal offense. In my opinion the offense has not been proved. This was an unbroken series of continuous acts of transportation, beginning at Hamburg and ending at Alberta, by which the sugar was merely moved across the United States in its transit between two foreign countries, and the Elkins act as I read it does not attempt to regulate such a transaction at all. Under the facts before the court, therefore, the defendant cannot be convicted of an offense under this indictment for taking part in the carriage. As I understand the stipulation, nothing in the facts agreed upon casts any doubt upon the entire good faith of the transaction—and especially there is nothing to justify the conclusion that when the sugar reached Philadelphia it had reached a point of destination in the proper sense of that word. Philadelphia was merely a way-station on the journey, where it became necessary to substitute inland carriage for carriage across the ocean, and the transportation was only halted long enough to enable the sugar to be loaded upon the cars and the requirements of the revenue laws to be complied with. As it seems to me, the truth and reality of this somewhat complicated

transaciton is not in doubt. All the parties from the beginning to the end intended to assist in a continuous transportation from one foreign country to another, and this intention was carried out in good faith and without interruption. As I have already said, the Elkins act does not regulate such shipments at all, and, as the indictment is preferred under that statute, a verdict in favor of the defendant must be rendered.

I may add a few words about a decision relied upon by the government. In my opinion, that case (Gulf, etc., Railway Co. v. Texas, 204· U. S. 403, 27 Sup. Ct. 360, 51 L. Ed. 540) rests upon a different state of facts. The corn there in question did not belong to the shipper, the Hardin Company, at all until it was delivered at Texarkana in the state of Texas. The previous owner of the corn had shipped it from South Dakota to Texarkana in order to deliver it there to the Hardin Company, and when the delivery was made the interstate shipment came to an end, and for the first time the Hardin Company became the owner of the corn. The corn was then in Texas, and the Hardin Company was not concerned with the previous transportation. Its right under the contract with the former owner was to have certain corn delivered to it at Texarkana, and it had no interest in the previous carriage. But, having received the corn in Texas, it thereupon assumed dominion over the property and proceeded to make a new contract concerning further shipment. The previous owner had only agreed to bring the corn to Texarkana, and, having fulfilled that obligation, stepped out of the transaction altogether. The new owner of the property—which was then upon the soil of Texas —the Hardin Company, and the railway company also, were each bound by the law of Texas thereafter, so far as further carriage inside the state was concerned. But here there are no such controlling facts. The sugar started in Germany, and was then and always thereafter destined, not for Philadelphia, but for Canada. The title never changed; the sugar was never delivered, but only passed along; indeed, the place of delivery was not within the United States at all, but in Canada; and whatever happened along the route was merely the carrying out by successive steps of the original contract made in Hamburg. The precise date when the Reading Railway Company came into the transaction does not seem to be vital. Whenever it came in, its purpose (like the purpose of all the other carriers) was to aid in carrying out a contract of through shipment from Germany to Canada, and in my opinion there was no violation of the Elkins act in so doing. So far as appears, such a transaction is not within the mischief which the act was intended to remedy, and it certainly does not seem to be within the language of the statute.

You will render a verdict for the defendant.

The indictment set out a departure from the legal rate of charge, a failure to observe the tariff filed with the commission, a giving and granting of a concession from the lawful rate, and a charging of less compensation than such rate. The stipulation was as follows:

"(1) That at all times mentioned in the said bill of indictment, as well before as afterwards, the Philadelphia & Reading Railway Company was and still is a common carrier by railroad from Philadelphia to Newberry Junction, in the state of Pennsylvania; the New York Central & Hudson

River Railroad Company was and still is a common carrier by railroad from Newberry Junction to Corning, in the state of New York; the Erie Railroad Company was and still is a common carrier by railroad from Corning to Buffalo, in the state of New York; the Mutual Transit Company was and still is a common carrier by water from Buffalo to Superior, in the state of Wisconsin, and in connection with the aforesaid common carriers by railroad was and still is a common carrier partly by railroad and partly by water under a common management, arrangement, or control from Philadelphia to Superior; the Great Northern Railway Company was and still is a common carrier by railroad from Superior to Sweet Grass, in the state of Montana; and the Alberta Railway & Irrigation Company was and still is a common carrier by railroad from Sweet Grass to Raymond, in the Province of Alberta, Canada, and the route of the said respective carriers formed a connecting continuous through route from Philadelphia to Raymond, Alberta.

"(2) That at all the times mentioned in said bill of indictment, the said Philadelphia & Reading Railway Company, the said New York Central Railroad Company, the said Erie Railroad Company and the said Mutual Transit Company, connecting carriers as aforesaid, had jointly established and published and filed, according to law, a joint tariff of rates, in connection with the official classification in force at such times, on freight, or property originating at Philadelphia and destined to Superior, Wis. The rate or charge in effect at said times on shipments of beet sugar between such points in accordance with such filed and published rates and classifications, being 26 cents per hundred pounds, in car load lots.

"(3) That at all the times mentioned in the said bill of indictment, the said Great Northern Railway Company and the said Alberta Railway & Irrigation Company had established, and published and filed according to law, a joint tariff or rates in connection with the official classification in force at such times, on shipments from Superior, Wis., to Raymond, Alberta. The rate or charge in effect at said times on shipments of beet sugar between such points in accordance with such filed and published rates and classification being $1.06 for each 100 pounds in car load lots.

"(4) That upon the 5th day of September, A. D. 1908, the Waaren-Commissions-Bank at Hamburg, Germany, did enter into a contract, commonly called a 'through bill of lading,' with the Oceanic Transit Company, for the transportation and shipment of 1,113,860 pounds of beet sugar, from the city of Hamburg, Germany, on the steamship 'Albano,' bound to the port of Philadelphia, and thence in care of the Great Northern Railway Company of America, 'per railroad or other conveyance,' to the town of Raymond, in the province of Alberta, in the Dominion of Canada, there to be delivered to the order of the Bank of Montreal, at a through rate or charge from the said city of Hamburg, Germany, to the said town of Raymond, Alberta, of 65 cents for each 100 pounds thereof.

"That upon said 5th day of September, 1908, the said Oceanic Transit Company, through its agent in Hamburg, John Heckemann, received for shipment and did ship upon the said steamship 'Albano' the said quantity of beet sugar, to be delivered at said port of Philadelphia by said steamship unto the order of one W. R. Huntington, of the city of New York, the agent of Wells-Fargo & Co., who were the agents of the said Oceanic Transit Company for immediate transportation, in bond to the said town of Raymond, Canada.

"(5) That on September 8, 1908, the said Oceanic Transit Company, at its chief office, situated at London, England, did issue a through waybill for the shipment and transportation of the said quantity of beet sugar, in which it is recited, inter alia, that said shipment of sugar was to be transported from Hamburg, Germany, to Philadelphia by the said steamship 'Albano,' and from Philadelphia to Raymond, Canada, by railroad and water route over the lines of transportation of the said Philadelphia & Reading Railway Company, Erie Railroad Company, Mutual Transit Company, and Great Northern Railway Company, the route from Philadelphia to Raymond, Alberta, being the same route as set out in paragraph 1, and delivered to the order of Bank of Montreal, at said town of Raymond, Canada, at the through rate or charge of 65 cents for each 100 pounds thereof in car load lots.

"That upon September 11, 1908, the said Philadelphia & Reading Railway

Company did at Philadelphia, in the said Eastern district of Pennsylvania (at least 17 days before the arrival of .said steamship 'Albano') then and there, in accordance with the aforesaid through bill of lading and waybill, issued by the said Oceanic Transit Company. agree with the said W. R. Huntington, agent of Wells-Fargo & Co., the aforesaid agent of the Oceanic Transit Company, for the shipment and transportation of the said quantity of beet sugar over the aforesaid continuous line or route of railroad and water line from Philadelphia to Raymond, Canada, as set out in paragraph 1 hereof, at a rate or charge of 55 cents for each 100 pounds thereof in car load lots; the remaining portion of the through rate of 65 cents being paid to the steamship 'Albano' as its proportion of the through rate for carriage from Hamburg to Philadelphia.

"(6) That upon September 22, 1908, William O. Hempstead, trading as O. G. Hempstead & Son, custom house brokers in the city of Philadelphia, acting for the said W. R. Huntington of Wells-Fargo & Co., the aforesaid agents of the Oceanic Transit Company, made entry of said shipment of beet sugar in the United States Custom House at the said port of Philadelphia, for immediate transportation and exportation in bond, from Philadelphia to Raymond, Canada, and he, the said William O. Hempstead, trading as O. G. Hempstead & Son, custom house brokers, did then and there enter into a bond in accordance with law, and the regulations of the Treasury Department in such cases made and provided, for the immediate transportation and exportation of the said quantity of beet sugar as aforesaid from Philadelphia to Raymond, Canada, in accordance with the through waybill and bill of lading issued by the said Oceanic Transit Company, as aforesaid.

"(7) That in accordance with the agreement with said W. R. Huntington, of Wells-Fargo & Co., aforesaid, agents of the Oceanic Transit Company, and the aforesaid through bill of lading and waybill issued by the said Oceanic Transit Company, the said Philadelphia & Reading Railway Company, did at Philadelphia, in the said Eastern district of Pennsylvania, on September 29, 1908, receive at the said port of Philadelphia, from the said steamship 'Albano' (which said steamship arrived at the port of Philadelphia on the 28th day of September, 1908), through the said William O. Hempstead, trading as O. G. Hempstead & Son, custom house brokers, the said quantity of beet sugar for shipment and transportation by the said common carriers as aforesaid over the continuous line or route as set forth in paragraph 1 from Philadelphia to Raymond, Canada, and did load the same on its freight cars and freight cars in its possession and under its control, and the same was thereupon transported by the common carriers aforesaid from Philadelphia to Raymond, Canada, by the said continuous line and steamship route as aforesaid from Philadelphia to Raymond, Canada, and through the Eastern district of Pennsylvania, at the rate or charge of 55 cents for each 100 pounds thereof, which was then and there the inland proportion of the through rate from Hamburg, Germany, aforesaid to the town of Raymond, Canada, aforesaid.

"(8) That the following papers may be offered in evidence at the trial without proof of execution:

"(a) Certified copy of Hamburg-American Line original bill of lading, dated Hamburg, September 5, 1908, recording the shipment by John Heckemann of the Oceanic Transit Company on the steamship 'Albano' of 4,996 bags of raw sugar, bound for the port of Philadelphia under· the order of W. R. Huntington, New York, for transportation in-bond to Raymond, Alberta, etc.

"(b) Certified copy of the original · entry of the said cargo of sugar at the port of Philadelphia, dated September 22, 1908, by D. B. Hempstead, of O. G. Hempstead & Son, showing the date of importation September 23, 1908, and having a record thereon that the said cargo was laden under the supervision of Harry N. Mills, inspector, on board the Philadelphia & Reading Railway Company cars at Philadelphia, Pa.

"(c) Duplicate original records of carriers' manifest of merchandise in bond, starting with the Philadelphia & Reading Railway Company at the port of Philadelphia for transportation to the town of Raymond, in the province of Alberta, in the Dominion of Canada, by way of Buffalo, Duluth, and Sweet Grass, Mont., being 20 in number, and each bearing the entry No.

15,579, containing a record of the initials of the cars, as well as the numbers thereof, and containing also a record of the inspectors of customs at the ports of Philadelphia, Buffalo, Superior, and Sweet Grass, Mont.

"(d) Copies of original Philadelphia & Reading Railway joint through merchandise waybills showing car initials and numbers, and description of the said cargo of raw sugar, the shipper, consignee, and destination, and the rate of freight and pro rata division of the freight between the several railroads transporting the said cargo, as set forth in the said copies of the said original joint through waybills.

"(e) Shipping order O. G. Hempstead & Son to Philadelphia & Reading Railway Company, dated Port Richmond Station, September 29, 1908, consignee, order of W. R. Huntington, destination, Raymond, Alberta, Canada, giving a description of the articles, to wit, the 1,113,860 pounds of sugar, and the memorandum copy of the Philadelphia & Reading Company shipping receipt issued to O. G. Hempstead dated September 29, 1908, and signed by O. H. Hagerman, agent of the Philadelphia & Reading Railway Company.

"(f) Copy of letter dated Philadelphia, September 21, 1908, George Ziegler, controller, to O. H. Hagerman, shipping and freight agent.

"(g) Copy of letter R. L. Russell, assistant freight agent, to O. H. Hagerman, shipping and freight agent, Port Richmond, dated Philadelphia, September 21, 1908, in relation to the waybill of the said shipment of sugar at a through rate of 55 cents per 100 pounds.

"(h) Copy of statement of advance charges at Port Richmond, Philadelphia, due O. G. Hempstead & Son, dated September 29, 1908, form 75.

"(i) Copy of report of charges of freight between the Philadelphia & Reading Railway Company and O. G. Hempstead & Son, dated September 29, 1908, in relation to the transportation of the said sugar from Philadelphia to Raymond, Alberta, form 178.

"(j) Copy of letter O. H. Hagerman to George Ziegler, controller, dated October 1, 1908.

"(k) Voucher No. S. P. 1,190, Auditor's bill No. 7,650, dated October 9, 1908, Philadelphia & Reading Railway Company to O. G. Hempstead & Son, for advanced freight charges.

"(l) Copy of voucher Philadelphia & Reading Railway Company to O. G. Hempstead & Son, dated October 9, 1908, for $1,113.93.

"(m) Letter George Ziegler, controller, to O. H. Hagerman, dated Philadelphia, November 2, 1908, in relation to credit for $6,126.23, for account of bill of O. G. Hempstead.

"(n) Certified copy of certificate of inspection at frontier port, Sweet Grass, Mont., dated November 14, 1908, showing that the said 4,996 bags of raw sugar had been inspected out of the United States.

"(o) Through bill of lading issued by Oceanic Transit Company.

"(p) Through waybill issued by Oceanic Transit Company.

"(q) Custom house regulations of 1908.

"It is agreed that for the purposes of a motion in arrest of judgment, and all subsequent proceedings thereon, the facts set out and papers referred to in the foregoing agreement be considered as part of the record in the case with the same force and effect as though fully set out therein."